**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| **SARA HERRMANN, *et al.*,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **CIV. ACT. NO. 1:24-cv-174-TFM-N** |
| | ) | |
| **JODIE NATA, *et al.*,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**MEMORANDUM OPINION AND ORDER**

Pending before the Court is the *Motion for Summary Judgment by Defendants Jodie Nata, Stephanie Paul, and Bernadette Dees* (Doc. 90, filed October 31, 2025) in which the remaining defendants in this action, Jodie Nata, Stephanie Paul, and Bernadette Dees motion the Court, pursuant to Fed. R. Civ. P. 56, enter summary judgment in their favor as to all of the claims that are brought against them by Plaintiffs Sara Herrmann and Melissa Hera. Having considered the motion, response, reply, and relevant law, the Court finds the motion for summary judgment (Doc. 90) is due to be **GRANTED**.

## I. JURISDICTION AND VENUE

The Court has subject matter jurisdiction over the claims in this action pursuant to 28 U.S.C. § 1331 (federal question). The Court has personal jurisdiction over the claims in this action because the events that gave rise to this action occurred within this district. *See Consol. Dev. Corp. v. Sherritt, Inc.*, 216 F.3d 1286, 1291-92 (11th Cir. 2000) ("Specific jurisdiction arises out of a party's activities in the forum that are related to the cause of action alleged in the complaint . . . . General personal jurisdiction, on the other hand, arises from a defendant's contacts with the forum that are unrelated to the cause of action being litigated. The due process requirements for general

personal jurisdiction are more stringent than for specific personal jurisdiction, and require a showing of continuous and systematic general business contacts between the defendant and the forum state."). Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events that gave rise to the claims in this matter occurred in this judicial district.

No party disputes or debates the Court's jurisdiction or venue, and the Court finds adequate support for both.

## II. BACKGROUND

### A. Factual Background[1]

[1] At the summary judgment stage, the facts are "what a reasonable jury could find from the evidence viewed in the light most favorable to the non-moving party." *Cantu v. City of Dothan*, 974 F.3d 1217, 1222 (11th Cir. 2020) (quoting *Scott v. United States*, 825 F.3d 1275, 1278 (11th Cir. 2016)). "[W]here there are varying accounts of what happened, the proper standard requires us to adopt the account most favorable to the non-movant." *Id*. (quoting *Smith v. LePage*, 834 F.3d 1285, 1296 (11th Cir. 2016)). Therefore, the recitation of facts here are those construed in favor of Plaintiff. "The 'facts' at the summary judgment stage are not necessarily the true, historical facts; they may not be what a jury at trial would, or will, determine to be the facts." *Id.*

A party is obliged to address an opposing party's assertion of fact that is presented in a motion for summary judgment pursuant to Fed. R. Civ. P. 56.

> If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may: (1) give an opportunity to properly support or address the fact; (2) consider the fact undisputed for purposes of the motion; (3) grant summary judgment if the motion and supporting materials – including the facts considered undisputed – show that the movant is entitled to it; or (4) issue any other appropriate order.

FED. R. CIV. P. 56(e)(1)-(4); *see also* S.D. ALA. CIVLR 56(b) ("The non-movant's brief must include: (1) all facts relied upon, each supported by a specific, pinpoint citation to the record: (2) all challenges to the movant's asserted facts; and (3) argument supported by legal authority as appropriate."); S.D. ALA. CIVLR 56(d) ("The Court will deem uncontroverted material facts to be admitted solely for the purpose of deciding the motion for summary judgment.").

Plaintiff Sara Herrmann ("Herrmann") is the daughter of Plaintiff Melissa Hera ("Hera"). Doc. 22 at 2-3. In October 2021, Herrmann moved to Conecuh County, Alabama from Michigan, where her father lived. Doc. 22 at 4.

Defendant Jodie Nata ("Nata") was the director of the Alabama Department of Human Resources in Conecuh County, Alabama ("the CCDHR"). *Id.* at 3. Defendant Stephanie Paul ("Paul") was employed in management with the CCDHR and was assigned as a case worker to Hera and Hermann. *Id.* Defendant Bernadette Dees was also a case worker with CCDHR to Hera and Herrmann. *Id.*

On October 19, 2021, Hera filed in the Juvenile Court of Conecuh County, Alabama ("the juvenile court") a child in need of supervision ("CHINS") petition for Herrmann and alleged Herrmann disobeyed her reasonable and lawful demands, was beyond her control, and was leaving home without permission.[2] Docs. 89-1, 89-3 at 85. At the time, CCDHR received a report from

---

[2] Under Alabama law, CHINS is defined as follows:

> A child who has been adjudicated by a juvenile court for doing any of the following and who is in need of care, rehabilitation, or supervision:
>
> a. Being subject to the requirement of compulsory school attendance, is habitually truant from school as defined by the State Board of Education in the Alabama Administrative Code. Notwithstanding the foregoing, a child shall not be found in need of supervision pursuant to this subdivision if the juvenile court determines that the parent, legal guardian, or legal custodian of the child was solely responsible for the nonattendance of the child.
>
> b. Disobeys the reasonable and lawful demands of his or her parent, legal guardian, or legal custodian and is beyond the control of the parent, legal guardian, or legal custodian.
>
> c. Leaves, or remains away from, the home without the permission of the parent, legal guardian, legal custodian, or person with whom he or she resides.
>
> d. Commits an offense established by law but not classified as criminal.

the State of Michigan, where there was an open child protective services case for Herrmann, that Hera and Herrmann were to move to Alabama. Docs. 89-2 at 4-5, 89-3 at 3, 9. Hera stated she learned about a CHINS petition from the mayor of Repton, Alabama, and filed the petition at the recommendation of Herrmann's Michigan social services worker . Doc. 89-3 at 3-5, 9. Hera stated Herrmann alleged she was a victim of sexual abuse and rape on multiple occasions by "eight or nine people." Doc. 89-3 at 11-13.

The juvenile court set Hera's CHINS petition for a hearing that was held on January 26, 2022, at which Herrmann was read her rights and admitted the allegations of the petition. Doc. 89-5 at 2. Nata, as a representative of CCDHR, was called by the juvenile court to attend the hearing at which CCDHR was ordered to open a child prevention case by the court and to provide services and intervention to the family.[3] Docs. 89-7 at 6; 89-8 at 4-5. On January 31, 2022, the juvenile court entered an order for the CHINS petition in which Herrmann was adjudicated and declared CHINS, declared "multi needs,[4]" ordered to enroll in school, and complete Ammi Kids Program with her mother. Doc. 89-6 at 2.

---

ALA. CODE § 12-15-102(4).

[3] The Alabama Department of Human Resources' ("the ADHR") CPS Prevention Policy and Procedures, which were in effect in 2022, describes a "CPS Prevention assessment" as:

> [T]he process used by child welfare staff to gather and analyze information in order to make decisions about children who may be at risk of maltreatment (in cases in which the intake information does not meet the Department's definitions of child abuse or neglect). This process is designed to determine whether family conditions and circumstances are presenting risks that are significant enough to warrant on-going services to prevent child maltreatment.

Doc. 89-9 at 7.

[4] Under Alabama law, "multiple needs child" is defined as follows:

On February 8, 2022, several CCDHR employees, including Paul, conducted an initial Individualized Service Plan[5] ("ISP") meeting with Hera at which was identified the goal for Herrmann to remain with Hera and a plan was developed to achieve that goal whereby Hera and CCDHR agreed to perform specified tasks. Doc. 89-10 at 2-5.

CCDHR produced an "Assessment of Children at Risk" ("the Assessment") for Hera, in which Herrmann was identified as a child at risk. Doc. 89-7. In the Assessment, CCDHR noted Kessler Stewart ("Stewart") lived in Hera's home in Repton, Alabama ("the Home"). *Id.* Stewart was a registered sex offender based on a charge of possession of child pornography for which he entered a plea of guilty on April 7, 2008, in Lee County, Florida. Doc. 89-12. As part of Stewart's sentence, he was prohibited from contact with a child under the age of eighteen (18) without court

---

> A child coming to the attention of the juvenile court or one of the entities listed herein who is at imminent risk of out-of-home placement or a placement in a more restrictive environment, and whose needs require the services of two or more of the following entities: Department of Youth Services, public school system (services for exceptional needs), Department of Human Resources, Department of Public Health, juvenile probation officers, or Department of Mental Health.

Ala. Code. § 12-15-501(2).

[5] The ADHR's "Individualized Service Plans" policy, which was in effect in 2022, describes an "Assessment," a part of the ISP process, as:

> Comprehensive family assessments are essential to the development of successful ISPs which are designed to achieve the desired outcomes of safety, permanency, stability, and overall well-being. Assessment begins at initial contact and continues until the family's case is safely closed. Information is gathered from and about all children and family members in order to gain an understanding of the needs to be addressed and to evaluate progress toward meeting those needs. The information is analyzed and conclusions are reached, thus creating a basis for informed decision-making and the development of the family's ISP. There should be a discussion of strengths, needs, and potential steps and services **prior to** ISP meetings.

Doc. 89-11 at 7 (emphasis in original).

approval. *Id.* at 4. In the Assessment, CCDHR noted Hera represented Stewart was her boyfriend that lived in the Home, he was a registered sex offender, but did not have related child restrictions. Doc. 89-7 at 7. The Assessment also noted Herrmann reported she had been sexually abused or raped multiple times and the State of Michigan had an open investigation as to Herrmann. Doc. 89-7 at 6.

Tyrone Boykin ("Boykin"), the Chief Deputy at the Conecuh County Sheriff's Office ("the CCSO"), states in his affidavit, on April 19, 2021, he inspected the Home to determine whether it was suitable for Stewart to live there, based on the requirements of the Alabama Sex Offender Registration and Community Notification Act ("ASORCNA"), ALA. CODE § 15-20A-1 through -48. Doc. 89-13 at 2. Boykin states he "completed" a "Sex Offender Registration Form" ("SOR Form") for Stewart and marked him as a new registrant. *Id.* As part of the SOR Form, Boykin states he asked Stewart if any minors lived in the Home to which he responded "none" and his response is recorded in the response box to the question prompt. Doc. 89-13 at 1, 3. Stewart signed and dated the SOR Form. *Id.* at 4.

In a separate affidavit that was signed by Hera on January 14, 2026, Hera disputes certain of Boykin's representations. Doc. 105-5. Before Hera purchased the Home, she states she and Stewart met with representatives of the CCSO, communicated their intent to reside together with her children, and inquired whether Stewart's status as a sex offender would preclude him from residing with them, to which "personnel at [the CCSO] told them he would be allowed to do so. *Id.* Hera states she, Stewart, and Herrmann met with Boykin at the CCSO and assisted Stewart to complete the SOR Form and wrote the names of her minor children in the appropriate prompt box. *Id.* Hera states she purchased the Home only after the CCSO approved Stewart to live there. *Id.* Hera states Boykin never inspected the Home. *Id.* Hera states on the date when Boykin claims he

inspected the Home, April 19, 2021, she had purchased the Home but resided in a camper on the property while tenants in the Home vacated it, after she provided the notice to do so. *Id.* at 1.

On July 30, 2021, Hera was indicted for selling a vehicle with an unsatisfied lien, in violation of Ala. Code § 32-8-87(s)(4). Doc. 89-14. On March 11, 2022, Hera pled guilty to the lesser offense of theft of property in the fourth degree, in violation of Ala. Code § 13A-8-5

Nata worked with Hera to return Herrmann to a "brick and mortar school" as the juvenile court ordered, but Herrmann eventually was no longer allowed on school property due to behavior and needs that the school could not meet. Docs. 89-6 at 2, 89-8 at 5.

On March 2, 2022, Nata executed an affidavit in support of a dependency petition and supplemental complaint for protective services[6] that was filed in the juvenile court. Doc. 89-16. In Nata's affidavit, she stated, "[CCDHR] is involved with the family due to allegations that the mother was permitting a sex offender to live in the home with [Herrmann]," "[Hera] is under indictment in the Circuit Court of Baldwin County for the charge of selling an automobile with an unsatisfied lien which is a felony," "the whereabouts of the father are unknown," "the child is having behavioral issues," "[t]he case was opened for ongoing protective services to better help the family," and "[Hera] has not been fully compliant." *Id.* at 8. The juvenile court set a hearing for the motion for protective service for March 10, 2022, appointed Hayden Sizemore ("Sizemore") as guardian ad litem for Herrmann, and notified Hera of her right to counsel for the hearing and the availability of appointed counsel if she was determined to be indigent. Doc. 89-18 at 2. On March 10, 2022, Hera completed and executed an "Affidavit of Substantial Hardship

---

[6] Under Alabama law, "protective supervision" is defined as "[a] legal status created by order of the juvenile court following an adjudication of dependency whereby a child is placed with a parent or other person subject to supervision by the Department of Human Resources." ALA. CODE § 12-15-301(11).

and Order (Request for Court-Appointed Attorney and/or Waiver of Fees)." Doc. 89-20. On the same date, the juvenile court granted Hera's request for appointment of counsel, and appointed Cierra White ("White") to represent her. Doc. 89-21. In Hera's affidavit, she states she appeared on March 10, 2022, in the juvenile court and informed the court she would not proceed without legal representation, and the court reset the hearing. Doc. 105-5. Hera states, at the hearing, no testimony was taken and no evidentiary hearing on the merits occurred. *Id.*

On April 13, 2022, the juvenile court entered a Protective Services Order which stated all of the necessary parties were given notice of the hearing and Nata, CCDHR's attorney, Hera, and Sizemore were present for the hearing. Doc. 89-22. The juvenile court ordered "Hera shall comply and participate with all protective services recommended by [CCDHR]," "failure of [Hera] to comply with any provisions of this order will be deemed harmful to the minor child and result in the removal of the child from the home and will subject [Hera] to the full range of the contempt power of this Court," "[CCDHR] shall schedule an [ISP] meeting with all parties present," and "the Court will set a review hearing in this matter upon the request of either party." *Id.* An electronic notice of the juvenile court's Protective Services Order and a copy of the Order was sent to Hera's counsel, Hermann's guardian ad litem, and Hera at her home address. Doc. 89-23.

On March 4, 2022, another ISP meeting was held with CCDHR employees at which was identified the goal for Herrmann to remain with Hera and the specified tasks to be performed by the parties to achieve the goal. Doc. 89-17. One of the tasks to be performed was for Herrmann to receive a psychological evaluation. *Id.* at 4. On March 29, 2022, Herrmann completed a psychological evaluation with Dr. Jack. C. Carney, Ph.D. ("Dr. Carney"), a licensed psychologist with Clarity Health. Doc. 89-24. Dr. Carney noted in his evaluation Herrmann discussed multiple incidents when she was raped, including by her uncle Michael and a man named Albert. *Id.* at 7-

8, 15. Dr. Carney diagnosed Herrmann with post-traumatic stress disorder ("PTSD"), major depressive disorder, mild neurocognitive disorder due to TBI, avoidant personality disorder, victim of child sexual abuse, and alcohol use disorder . *Id.* at 32-34. Dr. Carney recommended treatments to address Herrmann's deficiencies that he identified, including to consult a physician about medication treatment, develop an individual education program at school, address her PTSD through identified activities, and develop calming skills and coping skills. *Id.* at 38-45. Dr. Carney recommended Herrmann be removed from Hera's home immediately because a registered sex offender lived in the home, which increased the risk that Herrmann would be subject to further abuse, manipulation, and re-victimization. *Id.* at 37.

On May 9, 2022, Paul executed an affidavit in support of an ex parte motion for hearing and for custody of Herrmann that was filed in the juvenile court. Docs. 89-25, 89-26. In Paul's affidavit, she stated "[CCDHR] is involved with the family due to allegations that [Hera] was permitting a sex offender to live in the home with [Herrmann]," "[Hera] is under indictment in the Circuit Court of Baldwin County for the charge of selling an automobile with an unsatisfied lien which is a felony," "the whereabout of the father are unknown," "[Herrmann] is having behavioral issues," "[t]he case was opened for ongoing protective services to better help the family," "[Hera] has not been fully compliant," "[CCDHR] has been working with the family since 02/15/2022," "[t]here has been ongoing concern in reference to [Herrmann] being left unsupervised with her young sibling [ ] and no adult to help her take care of him," "[Herrmann] had several sexual abuse incidents while under the care of [Hera], which is concerning to [CCDHR]," "[Herrmann] had a psychological by Dr. Carney, which stated that [Herrmann] and all other children in the home should be removed from custody of [Hera]," "[t]he concerns include sex offender in the home, inadequate supervision, child neglect [and] sexual abuse, and abandonment," and "[t]he mother

and child have a history of sudden moves to avoid inquiry in their lives so [CCDHR] is concerned they will flee when they learn of the filing." Doc. 89-25 a 2-3. In the motion for hearing and for custody of the child, CCDHR, through its counsel, requested the Court to enter an ex parte order that set a hearing and to grant it temporary custody of Herrmann. Doc. 89-26 at 2-3. On May 9, 2022, the juvenile court set a hearing for the motion for May 11, 2022, for which Sizemore was appointed as guardian ad litem for Herrmann, and granted CCDHR custody of Herrmann pending further orders of the court. Doc. 89-27.

On May 10, 2022, another ISP meeting was held with CCDHR employees that Hera attended by phone. Doc. 89-17. The ISP stated Herrmann was in the custody of CCDHR but listed the goal for Herrmann to return her to Hera. Doc. 89-28 at 3. To achieve the goal, the plan that was developed in the ISP was for Herrmann to be placed at a licensed group home, Hera would participate in a psychological evaluation, and CCDHR would facilitate regular visitation with Herrmann, among other listed actions to be taken. *Id.* at 4.

On May 11, 2022, the hearing for the motion for custody of Herrmann was held by juvenile court. Doc. 89-29 at 2. At the hearing were Paul, the CCDHR's attorney, Hera, Hera's attorney, White, and Herrmann's guardian ad litem, Sizemore. *Id.* Based on the testimony and evidence that was presented at the hearing, the juvenile court entered an Order of Shelter Care on May 18, 2022, in which it found "it is in the best interest of [Herrmann] to be placed in the temporary custody of the [CCDHR] pending further orders of this court," "exigent circumstances existed which required the immediate temporary removal of [Herrmann] from the home of [Hera] on May 10, 2022 and reasonably efforts were not required/appropriate because of the emergency situation," "continuation of the child in the home of [Hera] would be contract to the welfare of [Herrmann]," and "[CCDHR] made all reasonable efforts to prevent removal of [Herrmann] from

her home, however, those efforts have been unsuccessful." *Id.* at 2-3. The juvenile court ordered "[c]ustody of [Herrmann] is transferred to the [CCDHR] with the Department having discretion in planning and placement pending an adjudicatory/disposition hearing within 60 days" and "[CCDHR] shall schedule an Individualized Service Plan (ISP) meeting with all parties present," among other things. *Id.* at 3. An electronic notice of the juvenile court's Order of Shelt Care and a copy of the Order was sent to Hera's counsel, Hermann's guardian ad litem, and Hera at her home address. Doc. 89-30.

On May 17, 2022, the juvenile court entered an Order Suspending Telephonic Communication Between Mother and Child in which it ordered telephonic communications between Hera and Herrmann suspended because it was detrimental to Herrmann's wellbeing and not in her best interest. Doc. 89-32 at 2. The juvenile court's order was based on facts that were presented in a joint motion by the CCDHR and Sizemore. *Id.* The juvenile court further ordered that if any party desired a hearing on the issue, they should file a motion to that effect. *Id.*

On June 8, 2022, Hera, through her attorney, White, filed with the juvenile court a Motion to Reinstate Telephonic Communication Between Mother and Child ("motion to reinstate"). Doc. 89-33. On the same date, the juvenile court granted in part the motion to reinstate and allowed telephonic communication to resume "solely upon the ability and willingness of [Herrmann's] facility to monitor both sides of the communication to ensure that no inappropriate communication occurs" and authorized Herrmann's guardian ad litem, Sizemore, to "approve the resumption of telephonic communication once she has verified the above conditions." Doc. 89-34 at 2. On June 9, 2022, the juvenile court amended its June 8, 2022 Order to clarify Herrmann's guardian ad litem, Sizemore, "shall have sole discretion to determine when and if any telephonic communications may occur" and "shall take under consideration the treatment team's recommendations, the child

and her emotional state and finally the ability of the facility to ensure the telephonic communications are beneficial to the child." Doc. 89-35 at 2.

In June 2022, Herrmann was placed at Laurel Oaks during which time Nata states she worked with Herrmann, "had age-appropriate discussion regarding foster care, court proceedings, and opportunities for her futures" and "discussed TLP/ILP services that would provide her with transportation and college tuition." Doc. 89-8 at 5. Nata states Herrmann repeatedly told her she did not want to return to the Home with Hera and clarified she neither threatened or offered bribes to Herrmann. *Id.* Nata states she was present when Herrmann was at Children's Hospital in July 2022, CCDHR complied with the advice of doctors and other medical professionals, information was provided to Nata that indicated Herrmann had caused injuries to herself, and CCDHR scheduled follow-up medical appointments and followed the advice of medical professionals. *Id.*

On September 1, 2022, Herrmann ran away from the group home where she lived, Bridges Group Home. Doc. 89-38. Herrmann travelled to the State of Michigan, where on August 18, 2022, a Consent Order for Sole Physical and Sole Legal Custody ("consent order") was entered by a Michigan court in which Donald Geoff Herrmann, Herrmann's father, was granted sole physical and legal custody of Herrmann. Doc. 89-39. The consent order was signed by both Herrmann's father and mother. *Id.* at 3.

On November 15, 2023, Herrmann's case came before the juvenile court on Sizemore's Motion for Final Hearing at which were present a representative of CCDHR and its counsel, Hera, and Sizemore. Doc. 89-40 at 2. Herrmann attending the hearing via telephone and, with the parties' consent, spoke privately with the court and Sizemore. *Id.* By a Final Order that was entered by the juvenile court on January 18, 2024, the court found, based on the pleadings that were filed and the court's and Sizemore's discussion with Herrmann, "[Herrmann] was dependent

and that all reasonable efforts were made by the [CCDHR] to make it possible for said child to return to her parents," "on or about September 1, 2022, [Herrmann] left the State of Alabama without permission," "on October 6, 2022, [Herrmann] married in the State of Michigan with the apparent consent of her father," "on or about September 28, 2023, [Herrmann] had a child in the State of Florida," "[Herrmann] is currently 18, having reached that age on September 19, 2023, and is currently residing in the State of Tennessee with the child and his alleged father," "the age of majority in the State of Tennessee is 18," and "[the Home] remains unsuitable for a minor child due to the continued presence of [Stewart], a convicted sex offender, who pled guilty to possession of child pornography in Lee County, Florida in 2006." *Id.* at 2-3. Based on the juvenile court's findings, it ordered "Herrmann is declared emancipated," "all reasonable efforts were made by the [CCDHR] to make it possible for said child to return to her home but said efforts were unsuccessful as said home remains unsuitable for a minor child," and "the actions taken by the [CCDHR] has been in said child's best interest and has served to safeguard her welfare and protect the public interest." *Id.* at 3.

In a sworn statement that was recorded at Herrmann's counsel's office, she described a conversation between Nata and her father that Nata described to her. Doc. 105-3 at 2. Herrmann states Nata tried to persuade her father to give custody of her to the State. In a sworn statement that was conducted via video teleconference, Donald Herrmann stated Nata contacted him because she wanted him to sign over custody of Herrmann to the State, which meant he would not have to pay child support, and wanted him to discuss Hera's parenting. Doc. 105-4 at 3-4. In Herrmann's sworn statement, she states Nata told her "my mom was talking shit about me, my mom was saying all these things that weren't true to try to make me mad at my mom to make false allegations against her to keep the kids in the system" and Nata wanted her to say Hera "was either abusive or

was letting people sexually abuse us." Doc. 105-3 at 3. Herrmann states Nata "was also trying to entice my friends at the time, other children, to say the same thing also, promising they would get the visitation with me up at the DHR building." *Id.* Herrmann states Nata "promised me and Anita that if Anita played along with what Jodie said then she would get . . . all us kids in her house." *Id.* at 5. Herrmann states Nata told her if said certain things about Hera "I would get to go to independent living, I would get a car, I would go to college. I would have [all] these perks and benefits that I didn't currently have at that moment. And she promised that me and the kids would stay together and that everything would be amazing." *Id.* at 4. Finally, Herrmann states "Nata told me I would stay in the system until I was 25, she was going to see [ ] to it because she was going to have me deemed mentally unstable." *Id.* at 7.

**B. Procedural Background**

Hera and Herrmann (collectively, "Plaintiffs") originally filed their Complaint with this Court on May 29, 2024, in which they brought claims against Defendant Bernadette Dees ("Dees"), Nata, Paul, Sizemore, and Laurel Oaks for civil rights violations, pursuant to 42 U.S.C. § 1983, conspiring to interfere with civil rights, pursuant to 42 U.S.C. § 1985, and negligent and wanton supervision. Doc. 1. Laurel Oaks, Dees, Nata, and Paul each filed separate answers. Docs. 6, 15, 19, 20.

On October 7, 2024, Plaintiffs filed an Amended Complaint in which they bring the following claims: "Count One and Two: Plaintiffs Herrmann and Hera Cause of Action Against Jody Nata Pursuant to 42 U.S.C. § 1983," "Count Three and Four: Plaintiff (*sic*) Hermann (*sic*) and Hera Against Stephanie Paul – 42 U.S.C. § 1983," "Count Five and Six: Plaintiffs Hermann (*sic*) and Hera Against Bernadette Dees," "Count Seven: Plaintiff Hermann (*sic*) Against Laurel Oaks Negligent and Wanton Supervision of Plaintiff Hermann (*sic*)," and "Count Eight: Plaintiff

(*sic*) Hermann (*sic*) and Hera Against Defendants Jody Nata, Stephanie Paul, and Hayden Sizemore Pursuant to 42 U.S.C. § 1985." Doc. 22. The first paragraph that follows each of the count headings in the Amended Complaint contains the following statement as part of a jurisdiction analysis: "This is a civil rights action in which the Plaintiff (*sic*) seeks relief for the violation of their rights secured by 42 USC § 1983, § 1985, and § 1988, the Fourth and Fourteenth Amendments to the United States Constitution." *Id.* Laurel Oaks, Dees, Nata, and Paul each filed separate answers. Docs. 24, 25, 26, 27.

On October 28, 2024, Sizemore filed a motion to dismiss (Doc. 28) the claims that are brought against her, which the Court granted and dismissed those claims with prejudice (Doc. 62). On November 18, 2025, Plaintiffs and Laurel Oak filed a Notice of Settlement and Motion to Dismiss Laurel Oaks (Doc. 98) that the Court granted and dismissed Plaintiffs' claims against Laurel Oaks (Doc. 99).

On October 30, 2025, Nata, Paul, and Dees ("Defendants") filed a motion to file under seal their brief in support of their motion for summary judgment as well as exhibits in support of the same, and in accordance with S.D. Ala. GenLR 5.2 filed the same under seal. Docs. 88, 89. On October 31, 2025, Defendants filed an unsealed motion for summary judgment in which they state the arguments that support their position as well as generically describe the evidence in support of their motion. Doc. 90.

The Court entered an Order on November 13, 2025, that held in abeyance the briefing on the motion for summary judgment pending the resolution of the sealing issue, and directed the parties to confer to determine whether a lesser means could be used to protect the confidential information or, if not, provide the Court a supplemental brief that addressed the common law right of public access to judicial proceedings and the factors to show good cause to overcome that right,

which are stated in *Romero v. Drummond Co., Inc.*, 480 F.3d 1234 (11th Cir. 2007), and *Chicago Tribune Co. v. Bridgestone/Firestone, Inc.*, 263 F.3d 1304 (11th Cir. 2001). Doc. 96. The Court also set the motion to seal for a hearing to be held on December 5, 2025. *Id.*

Defendants filed their supplemental brief on December 1, 2025, in which they state their counsel conferred with Plaintiffs' counsel, agreed most of the exhibits that Defendants filed in support of their motion for summary judgment are statutorily protected by confidentiality, and provided their analysis as to why those exhibits, as well as the motion for summary judgment, should remain under seal. Doc. 101. However, Defendants stated some of the exhibits that were filed under seal were not protected by confidentiality and are publicly available, which include Exhibits 9, 11, 12, 13, 14, 15, 31, 37, 38, 39, 43, and 44. On December 9, 2025, the Court directed the Clerk of Court to unseal Exhibits 9, 11, 12, 13, 14, 15, 31, 37, 38, 39, 43, and 44 (Docs. 89-9, 89-11, 89-12, 89-13, 89-14, 89-15, 89-31, 89-37, 89-38, 89-39, 89-43, and 89-44) that were filed in support of Defendants' motion for summary judgment. Doc. 102. The Court further ordered Defendants to file an unsealed, redacted version of their summary judgment brief and, for any response or reply brief that was filed, the parties were ordered to file such brief under seal and file an unsealed, redacted version of the brief. *Id.*

Defendants filed their redacted brief in support of their motion for summary judgment. Doc. 104. Plaintiffs filed their brief in opposition to the motion for summary judgment, and Defendants filed their reply thereto, under seal and in redacted form. Docs. 105, 108, 109, 110. The motions are fully briefed and ripe for review, and the Court finds oral argument is unnecessary to resolve the issues that are presented in the motions.

On September 30, 2025, the Court denied the motion to seal (Doc. 88) and unsealed the remaining sealed exhibits that were filed in support of the motion for summary judgment, and

response and reply thereto, as well as unsealed the motion for summary judgment briefing that was filed under seal. Doc. 126.

## III. STANDARD OF REVIEW

A party in a lawsuit may move a court to enter summary judgment before trial. FED. R. CIV. P. 56(a), (b). Summary judgment is appropriate when the moving party establishes there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a); *see also Greenberg v. BellSouth Telecomms., Inc.*, 498 F.3d 1258, 1263 (11th Cir. 2007) ("Summary judgment is appropriate 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine [dispute] as to any material fact and that the moving party is entitled to judgment as a matter of law.'"). "[T]he substantive law will identify which facts are material." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see also Ritchey v. S. Nuclear Operating Co.,* 423 F. App'x 955 (11th Cir. 2011) (quoting *Anderson*, 477 U.S. at 248).[7] At the summary judgment juncture, the court does not "weigh the evidence and determine the truth of the matter," but solely "determine[s] whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. Only disputes about the material facts will preclude the granting of summary judgment. *Id.*

The movant bears the initial burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A party must support its assertion that there is no genuine issue of material fact by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . admissions, interrogatory answers,

[7] In this Circuit, "[u]npublished opinions are not considered binding precedent, but they may be cited as persuasive authority." 11th Cir. R. 36-2 (effective Dec. 1, 2014); *see also Henry v. Comm'r of Soc. Sec.*, 802 F.3d 1264, 1267 n.1 (11th Cir. 2015) (per curiam) ("Cases printed in the Federal Appendix are cited as persuasive authority.").

or other materials" or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." FED. R. CIV. P. 56(e)(1). The admissibility of evidence is subject to the same standards and rules that govern admissibility of evidence at trial. *Clemons v. Dougherty County*, 684 F.2d 1365, 1369 n.5 (11th Cir. 1982) (citing *Pan-Islamic Trade Corp. v. Exxon Corp.*, 632 F.2d 539, 556 (5th Cir. 1980)).

Once the movant meets its burden under Fed. R. Civ. P. 56, the non-movant must go beyond the pleadings and designate specific facts showing there is a genuine issue for trial. *Matsushita Elec. Indus. Co., Ltd. V. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). "A genuine issue of material fact exists when 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Moore ex rel. Moore v. Reese*, 637 F.3d 1220, 1232 (11th Cir. 2011) (quoting *Anderson*, 477 U.S. at 248). The court must view the facts and draw all reasonable inferences in favor of the non-moving party. *Id*. (citing *Rosario v. Am. Corrective Counseling Servs., Inc.*, 506 F.3d 1039, 1043 (11th Cir. 2007)); *Greenberg*, 498 F.3d at 1265 ("We view the evidence and all factual inferences therefrom in the light most favorable to the party opposing the motion."). However, to avoid summary judgment, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586 (citations omitted). Conclusory assertions, unsupported by specific facts, that are presented in affidavits opposing the motion for summary judgment are likewise insufficient to defeat a proper motion for summary judgment. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990). "Speculation does not create a *genuine* issue of fact." *Cordoba v. Dillard's, Inc.*, 419 F.3d 1169, 1181 (11th Cir. 2005) (citation omitted). If the evidence is merely colorable or is not significantly probative, summary judgment may be granted. *See Anderson*, 477 U.S. at 249-50 (emphasis in

original) (citations omitted). In short, summary judgment is proper after adequate time for discovery and upon motion against a party who fails to make a showing that is sufficient to establish the existence of an element that is essential to that party's case. *Celotex*, 477 U.S. at 322.

Finally, Fed. R. Civ. P. 56(e) also provides that "[i]f a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56€, the court may: (1) give an opportunity to properly support or address the fact; (2) consider the fact undisputed for purposes of the motion; (3) grant summary judgment if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it; or (4) issue any other appropriate order." FED. R. CIV. P. 56(e).

## IV. DISCUSSION AND ANALYSIS

Defendants make several arguments in support of their motion for summary judgment: (1) Plaintiffs fail to state a procedural due process claim pursuant to 42 U.S.C. § 1983, (2) Plaintiffs' § 1983 claims are barred by the applicable statute of limitations, (3) Plaintiffs' due process claims pursuant to § 1983 are barred by the *Rooker-Feldman* doctrine, (4) Plaintiffs' claims are barred by qualified immunity, (5) Nata and Paul are entitled to statutory immunity, (6) Nata and Paul are entitled to prosecutorial immunity, and (7) Plaintiff's civil conspiracy claim must be dismissed for failure to state a claim. Doc. 89 at 33. The Court will address Defendants' arguments, and Plaintiffs' responses thereto, in turn.

### A. Plaintiffs fail to state a procedural due process claim pursuant to 42 U.S.C. § 1983

Defendants argues the substance of Plaintiffs' allegations is Defendants allegedly lied to the juvenile court to obtain custody of Herrmann, which would be a procedural due process violation, not a substantive due process violation. Doc. 89 at 8. Further, Defendants argue Plaintiffs failed to allege there was no state process to remedy the alleged procedural defects. *Id.*

at 8-16.

In response, Plaintiffs concede their claims that are related to procedural due process are due to be dismissed, but argue their claims are properly alleged to implicate substantive due process violations because the conduct that is alleged can be characterized as arbitrary or conscience shocking in a constitutional sense. Doc. 105 at 14-18.

In reply, Defendants argue Plaintiffs' purported substantive due process claims are barred by the *Rooker-Feldman* doctrine and, further, do not rise to the level of arbitrary or conscience shocking since CCDHR was not involved with Plaintiffs until Hera filed the CHINS petition in which she alleged Herrmann was beyond her control and in need of care, rehabilitation, or supervision. Doc. 108 at 2-5.

> The Due Process Clause of the Fourteenth Amendment provides "nor shall any State deprive any person of life, liberty, or property, without due process of law." U.S. CONST. AMEND. XIV, § 1. The Supreme Court's interpretation of this clause explicates that the amendment provides two different kinds of constitutional protection: procedural due process and substantive due process. *Cf. Zinermon v. Burch*, 494 U.S. 113, 125, 110 S. Ct. 975, 983, 108 L. Ed. 2d 100 (1990). A violation of either of these kinds of protection may form the basis for a suit under section 1983. *Id*.
>
> [ ] The substantive component of the Due Process Clause protects those rights that are "fundamental," that is, rights that are "implicit in the concept of ordered liberty," *Palko v. Connecticut*, 302 U.S. 319, 325, 58 S. Ct. 149, 152, 82 L. Ed. 288 (1937). The Supreme Court has deemed that most--but not all--of the rights enumerated in the Bill of Rights are fundamental; certain unenumerated rights (for instance, the penumbral right of privacy, *see Planned Parenthood v. Casey*, [505] U.S. [833], [851-52], 120 L. Ed. 2d 674, 112 S. Ct. 2791, 2807 (1992)) also merit protection. It is in this framework that fundamental rights are incorporated against the states. A finding that a right merits substantive due process protection means that the right is protected "against 'certain government actions regardless of the fairness of the procedures used to implement them.'" *Collins v. City of Harker Heights*, [503] U.S. [115], [125] , 112 S. Ct. 1061, 1068, 117 L. Ed. 2d 261 (1992) (quoting *Daniels v. Williams*, 474 U.S. 327, 331, 106 S. Ct. 662, 665, 88 L. Ed. 2d 662 (1986)).

Although the Supreme Court has extended substantive due process protection to certain unenumerated rights, it has not extended Fourteenth Amendment coverage to a host of other areas. In fact,

> the Court has always been reluctant to expand the concept of substantive due process because guideposts for responsible decisionmaking in this uncharted area are scarce and open-ended. The doctrine of judicial self-restraint requires us to exercise the utmost care whenever we are asked to break new ground in this field.

*Collins*, [503] U.S. at [125], 112 S. Ct. at 1068 (citation omitted). Hence, remaining largely outside the scope of substantive due process jurisprudence are tort law, *see Daniels*, 474 U.S. at 332, 106 S. Ct. at 665, and public employment law, *see, e.g.*, *Bishop v. Wood*, 426 U.S. 341, 350, 96 S. Ct. 2074, 2080, 48 L. Ed. 2d 684 (1976), *and Board of Regents v. Roth*, 408 U.S. 564, 577-78, 92 S. Ct. 2701, 2709-10, 33 L. Ed. 2d 548 (1972).

In short, areas in which substantive rights are created only by state law (as is the case with tort law and employment law) are not subject to substantive due process protection under the Due Process Clause because "substantive due process rights are created only by the Constitution." *Regents of Univ. of Mich. v. Ewing*, 474 U.S. 214, 229, 106 S. Ct. 507, 515, 88 L. Ed. 2d 523 (1985) (Powell, J., concurring). As a result, these state law based rights constitutionally may be rescinded so long as the elements of procedural--not substantive--due process are observed.

[ ] Substantive due process rights differ from their procedural counterparts in a second, important fashion: the manner in which a violation of the right occurs. A violation of a substantive due process right, for instance, is complete when it occurs; hence, the availability *vel non* of an adequate post-deprivation state remedy is irrelevant. Because the right is "fundamental," no amount of process can justify its infringement. By contrast, a procedural due process violation is not complete "unless and until the State fails to provide due process." *Zinermon*, 494 U.S. at 123, 110 S. Ct. at 983. In other words, the state may cure a procedural deprivation by providing a later procedural remedy; only when the state refuses to provide a process sufficient to remedy the procedural deprivation does a constitutional violation actionable under section 1983 arise.

[ ] A final distinctive characteristic of substantive due process rights is the typical remedy awarded to one whose rights have been violated. In substantive due process cases, the claimant seeks compensatory damages for the value of the deprived right. In procedural due process cases, however, although the claimant may seek compensatory damages, the primary relief sought is equitable: for instance, in an employment case, the claimant typically seeks reinstatement and a properly conducted pre-termination hearing. These process-based remedies are unique to procedural due process rights and, because of the definition of a substantive due process right as one which may not be violated regardless of the process, may not

> be awarded to one claiming a substantive due process violation. Because the relief awarded to a person claiming a substantive due process violation primarily is monetary, not equitable, a substantive due process deprivation likely is of substantially greater monetary value than a procedural due process deprivation.

*McKinney v. Pate*, 20 F.3d 1550, 1555-58 (11th Cir. 1994).

> The Supreme Court has held that parents have a constitutionally protected liberty interest in the care, custody and management of their children. *See Santosky*, 102 S. Ct. at 1397. "As a general rule, therefore, before parents may be deprived of the care, custody or management of their children without their consent, due process -- ordinarily a court proceeding resulting in an order permitting removal -- must be accorded to them." *Tenenbaum v. Williams*, 193 F.3d 581, 593 (2d Cir. 1999) (citing *Stanley v. Illinois*, 405 U.S. 645, 649, 92 S. Ct. 1208, 1212, 31 L. Ed. 2d 551 (1972)). "At the same time, however, the State has a profound interest in the welfare of the child, particularly his or her being sheltered from abuse." *Tenenbaum,* 193 F.3d at 593-94.

*Doe v. Kearney*, 329 F.3d 1286, 1293-94 (11th Cir. 2003).

"To state a claim for relief in an action brought under [42 U.S.C.] § 1983, [Plaintiffs] must establish that they were deprived of a right secured by the Constitution or laws of the United States, and that the alleged deprivation was committed under color of state law. . . . [T]he under-color-of-state-law-element of [42 U.S.C.] § 1983 excludes from its reach merely private conduct, no matter how discriminatory or wrongful." *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 49-50, 119 S. Ct. 977, 985, 143 L. Ed. 2d 130 (1999) (citation and internal quotation marks omitted).

To prevail against an official in their individual capacity, a plaintiff is required to show the official "w[as] personally involved in acts or omissions that resulted in the constitutional deprivation." *Hale v. Tallapoosa County*, 50 F.3d 1579, 1582 (11th Cir. 1995) (citing *Zatler v. Wainwright*, 802 F.2d 397, 401 (11th Cir. 1986)). "A [42 U.S.C.] § 1983 claim requires proof of an affirmative *causal connection* between the defendant's acts or omissions and the alleged constitutional deprivation." *Troupe v. Sarasota County,* 419 F.3d 1160, 1165 (11th Cir. 2005) (emphasis added) (citing *Zatler*, 802 F.2d at 401). A defendant must be the proximate cause of a

plaintiff's injuries; that is, there must not be an intervening, independent cause for the injuries that breaks the chain of causation. *Id.*

Here, insofar as Plaintiffs allege procedural due process violations, they have failed to adequately state such a claim. "A claim under section 1983 asserting a 'denial of procedural due process requires proof of three elements: (1) a deprivation of a constitutionally-protected liberty or property interest; (2) state action; and (3) constitutionally-inadequate process.'" *Yarbrough v. Decatur Hous. Auth.*, 941 F.3d 1022, 1026 (11th Cir. 2019) (quoting *Grayden v. Rhodes*, 345 F.3d 1225, 1232 (11th Cir. 2003)). "[O]nly when the state refuses to provide a process sufficient to remedy the procedural deprivation does a constitutional violation actionable under section 1983 arise." *McKinney*, 20F.3d at 1557.

> Even if there is a procedural defect in an administrative proceeding, "such a claim will not be cognizable under [section] 1983 if the state provides a means by which to remedy the alleged deprivations." *Foxy Lady, Inc. v. City of Atlanta*, 347 F.3d 1232, 1238 (11th Cir. 2003). So, a plaintiff who seek relief under section 1983 must allege that there is no available state process.

*Mata Chorwadi, Inc. v. City of Boynton Beach*, 66 F.4th 1259, 1267 (11th Cir. 2023).

> Assuming a plaintiff has shown a deprivation of some right protected by the due process clause, [courts]--when determining if a plaintiff has stated a valid procedural due process claim--look to whether the available state procedures were adequate to correct the alleged procedural deficiencies. *See McKinney,* 20 F.3d at 1563; *see also Bell v. City of Demopolis, Alabama,* 86 F.3d 191, 192 (11th Cir.1996); *Narey v. Dean,* 32 F.3d 1521, 1527-28 (11th Cir.1994). If adequate state remedies were available but the plaintiff failed to take advantage of them, the plaintiff cannot rely on that failure to claim that the state deprived him of procedural due process. *See McKinney,* 20 F.3d at 1565 ("The fact that [McKinney] failed to avail himself of the full procedures provided by state law . . . does not constitute a sign of their inadequacy."); *Bell,* 86 F.3d at 192; *Narey,* 32 F.3d at 1528. And, to be adequate, the state procedure need not provide all the relief available under section 1983. *See McKinney,* 20 F.3d at 1564. Instead, the state procedure must be able to correct whatever deficiencies exist and to provide plaintiff with whatever process is due.

*Cotton v. Jackson*, 216 F.3d 1328, 1331 (11th Cir. 2000).

Under Alabama law, the juvenile courts "exercise exclusive original jurisdiction of juvenile court proceedings in which a child is alleged to have committed a delinquent act, to be dependent, or to be in need of supervision." ALA. CODE § 12-15-114(a). One of the stated purposes of the Alabama Juvenile Justic Act ("AJJA") is "to facilitate the care, protection, and discipline of children who come under the jurisdiction of the juvenile court" and to further said purpose, one of the goals of the AJJA is "[t]o remove [a child] from the custody of his or her parent or parents only when it is judicially determined to be in his or her best interests or for the safety and protection of the public." ALA. CODE § 12-15-101(a), (b)(2). The AJJA is to be "liberally construed to the end that each child coming under the jurisdiction of the juvenile court shall receive the care, guidance, and control, preferably in his or her own home, necessary for the welfare of the child and the best interests of the state." ALA. CODE § 12-15-101(d).

"A juvenile petition alleging delinquency, in need of supervision, or dependency may be signed by any person 18 years of age or older, other than a juvenile court intake officer, who has knowledge of the facts alleged or is informed of them and believes that they are true." ALA. CODE § 12-15-121(a). "When a child alleged to be dependent has been removed from the custody of the parent, legal guardian, or legal custodian and has not been returned to same, a hearing shall be held within 72 hours from the time of removal, Saturdays, Sundays, and holidays included, to determine whether continued shelter care is required." ALA. CODE § 12-15-308(a). If a child is found to be dependent, a juvenile court may make any of several dispositions to protect the welfare of the child, including "[p]lace the child under protective supervision under the Department of Human Resources." ALA. CODE § 12-15-314(a)(2). Final orders of the juvenile court may be appealed to the Alabama Court of Civil Appeals and "shall take priority over other cases filed on appeal except for emergency matters." ALA. CODE § 12-15-323; ALA. R. APP. P. 3, 4; ALA. R. JUV. P. 28.

Nonfinal orders of the juvenile may be presented to an appellate court through a petition for a writ of mandamus. ALA. R. APP. P. 21.

Here, Plaintiffs have neither shown the available state procedures were inadequate to correct their alleged procedural deficiencies nor took advantage of those procedures, and Plaintiffs concede they fail to state a procedural due process claim.

Accordingly, summary judgment is due to be **GRANTED** as to Plaintiffs' procedural due process claims.

As to Plaintiffs' substantive due process claims, they argue Nata and Paul's alleged acts can be characterized as arbitrary or conscience shocking in a constitutional sense to be considered a substantive due process violation. Here, Hera has a liberty interest in the care, custody, and management of Herrmann and alleges Defendants violated that liberty interest. Plaintiffs have, therefore, sufficiently alleged a substantive due process violation. *See Maddox v. Stephens*, 727 F.3d 1109, 1119 (11th Cir. 2013).

> However, "not every wrong committed by a state actor rises to the level of a 'constitutional tort,' sufficient to trigger a substantive due process violation," *Lee v. Hutson,* 810 F.2d 1030, 1032 (11th Cir.1987), as "the Constitution does not protect against all encroachments by the state onto the interests of individuals," *Robertson v. Hecksel,* 420 F.3d 1254, 1262 (11th Cir.2005). The Supreme Court has "previously rejected claims that the Due Process Clause should be interpreted to impose federal duties that are analogous to those traditionally imposed by state tort law," *Collins* [ ], 503 U.S. [at] 128, 112 S. Ct. [at] 1070, 117 L. Ed. 2d 261 [ ], and it is clear that "[m]ere negligence does not rise to the level of a Fourteenth Amendment violation," *Bendiburg v. Dempsey,* 909 F.2d 463, 470 (11th Cir.1990); *see also Cnty. of Sacramento v. Lewis,* 523 U.S. 833, 849, 118 S. Ct. 1708, 1718, 140 L. Ed. 2d 1043 (1998) ("[L]iability for negligently inflicted harm is categorically beneath the threshold of constitutional due process."); *Waddell v. Hendry Cnty. Sheriff's Office,* 329 F.3d 1300, 1305 (11th Cir.2003) ("We know for certain . . . that a showing of negligence is insufficient to make out a constitutional due process claim."). Instead, plaintiffs face a high bar when attempting to establish a substantive due process violation as "conduct by a government actor will rise to the level of a substantive due process violation only if the act can be characterized as arbitrary or conscience shocking in a constitutional sense." *Waddell,* 329 F.3d at 1305. Even intentional wrongs seldom violate the Due

> Process Clause, *id.,* and "only the most egregious official conduct can be said to be 'arbitrary in the constitutional sense,'" *Cnty. of Sacramento,* 523 U.S. at 846, 118 S. Ct. at 1716 (quoting *Collins,* 503 U.S. at 129, 112 S. Ct. at 1071). "Determinations of what is egregious conduct must not be made in the glow of hindsight; decisions made by a government actor *must be egregious—that is, shock the conscience—at the time the government actor made the decision.*" *Waddell,* 329 F.3d at 1305. Conduct intended to injure in some way that is unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level, *id.,* and we must conduct an "exact analysis of circumstances before any abuse of power is condemned as conscience shocking," *Cnty. of Sacramento,* 523 U.S. at 850, 118 S. Ct. at 1718–19.
>
> [T]he Supreme Court "has always been reluctant to expand the concept of substantive due process because guideposts for responsible decisionmaking in this unchartered area are scarce and open-ended." *Collins,* 503 U.S. at 125, 112 S. Ct. at 1068; *see also Waddell,* 329 F.3d at 1304 ("We must take seriously the Supreme Court's caution against expanding the concept of substantive due process."). Specifically, in § 1983 cases asserting violations of parental liberty interests, "we are venturing into the murky area of unenumerated constitutional rights." *Robertson,* 420 F.3d at 1256 (quoting *McCurdy v. Dodd,* 352 F.3d 820, 825 (3d Cir.2003)). In determining whether the plaintiff has alleged an actual deprivation of a constitutional violation, we must "tread lightly" because, "[b]y extending constitutional protection to an asserted right or liberty interest, we, to a great extent, place the matter outside the arena of public debate and legislative action. We must therefore 'exercise the utmost care whenever we are asked to break new ground in this field,' lest the liberty protected by the Due Process Clause be subtly transformed into the policy preferences of the Members of this Court." *Id.* (quoting *Washington v. Glucksberg,* 521 U.S. 702, 720, 117 S. Ct. 2258, 2267–68, 138 L. Ed. 2d 772 (1997)).

*Id.* at 1119-20.

Therefore, Plaintiffs have sufficiently alleged a substantive due process violation, but the Court has not determined whether Defendants alleged acts rise to the level of a constitutional tort.

**B. *Rooker-Feldman***

Assuming Plaintiffs have satisfactorily pled their substantive due process claims rise to the level of a constitutional tort, which Defendants maintain they have not, Defendants argue the *Rooker-Feldman* doctrine bars those claims. In *Behr v. Campbell*, the Eleventh Circuit clarified the boundaries of the doctrine:

> To whatever extent we have not been clear enough before, we aim to be now. *Rooker-Feldman* means that federal district courts cannot review or reject state court judgments rendered before the district court litigation began. It is, really, a straightforward application of the statutes establishing our jurisdiction. The doctrine does not need to be a source of confusion in federal law. Nor can it be a broad means of dismissing all claims related in one way or another to state court litigation. Its application is narrow and—surprisingly enough—quite simple. It bars only "cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments." *Exxon Mobil* [*Corp. v. Saudi Basic Indus. Corp.*], 544 U.S. [280,] 284 [(2005)]; *see also Nicholson* [*v. Shafe*], 558 F.3d [1266,] 1274 [(11th Cir. 2009)]. The injury must be caused by the judgment itself. Period. And considering whether a claim is "inextricably intertwined" with a state court judgment is not a second prong of the analysis; it is merely a way of ensuring that courts do not exercise jurisdiction over the appeal of a state court judgment simply because the claimant does not call it an appeal of a state court judgment. Anything other than that kind of appeal can and should be addressed by other preclusion or abstention doctrines. *See, e.g., Lozman v. City of Riviera Beach*, 713 F.3d 1066, 1074-80 (11th Cir. 2013).
>
> In short, district courts should keep one thing in mind when *Rooker-Feldman* is raised: it will almost never apply.

*Behr v. Campbell*, 8 F.4th 1206, 1212 (11the Cir. 2021).

Here, Plaintiffs claims are based on Defendants alleged fabrications that were presented to the juvenile court and related acts, and is not a direct appeal of the court's orders. Therefore, *Rooker-Feldman* does not apply.

Accordingly, Defendants' motion for summary judgment based on their arguments that the *Rooker-Feldman* doctrine bars Plaintiffs' claims is **DENIED**.

### C. Qualified Immunity

Defendants argue Plaintiffs' due process claims, whether procedural or substantive, are barred by qualified immunity. Doc. 89 at 21-31. In response, Plaintiffs concede Dees is entitled to qualified immunity but maintain Nata and Paul are not. Doc. 105 at 2.

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional

rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). To be protected by qualified immunity, the government official must first demonstrate that he was acting within the scope of his discretionary authority when the alleged wrongful acts occurred. *Garcia v. Casey*, 75 F.4th 1176, 1185 (11th Cir. 2023) (citing *Melton v. Abston*, 841 F.3d 1207, 1221 (11th Cir. 2016)); *Harbert Int'l, Inc. v. James*, 157 F.3d 1271, 1281 (11th Cir. 1998). "Once it has been determined that an official was acting within the scope of his discretionary authority, the burden shifts to the plaintiff to establish that qualified immunity is inappropriate." *Garcia*, 75 F.4th at 1185 (quotation omitted).

An officer acts within his discretionary authority when his behavior is "(1) undertaken pursuant to the performance of his duties, and (2) within the scope of his authority." *Est. of Cummings v. Davenport*, 906 F.3d 934, 940 (11th Cir. 2018) (quoting *Harbert Int'l*, 157 F.3d at 1282); *Lenz v. Winburn*, 51 F.3d 1540, 1545 (11th Cir. 1995). "Our inquiry is two-fold. We ask whether the government employee was (a) performing a legitimate job-related function (that is, pursuing a job-related goal), (b) through means that were within his power to utilize." *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1265 (11th Cir. 2004) (citation omitted). "In applying each prong of this test, we look to the general nature of the defendant's action, temporarily putting aside the fact that it may have been committed for an unconstitutional purpose, in an unconstitutional manner, to an unconstitutional extent, or under constitutionally inappropriate circumstances." *Mikko v. City of Atlanta*, 857 F.3d 1136, 1144 (11th Cir. 2017) (quoting *Holloman*, 370 F.3d at 1266). Therefore, an officer may still be acting within his discretionary authority even if/when violating the constitution. The relevant analysis is "whether the act complained of, if done for a proper purpose, would be within, or reasonably related to, the outer

perimeter of an official's discretionary duties." *Harbert Int'l v. James*, 157 F.3d 1271, 1282 (11th Cir. 1998) (citations and internal quotations omitted).

Courts utilize a two-part framework to evaluate whether qualified immunity applies to a claim. *Castle v. Appalachian Tech. Coll.*, 631 F.3d 1194, 1197 (11th Cir. 2011). The first element is whether the plaintiff's allegations, if true, establish a constitutional violation. *Pearson*, 555 U.S. at 232 (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). The second element is whether the constitutional right at issue was "clearly established" at the time of the defendant's alleged misconduct. *Id*. at 232. "Clearly established means that, at the time of the officer's conduct, the law was sufficiently clear that every reasonable official would understand that what he is doing is unlawful." *Garcia*, 75 F.4th at 1185 (quoting *District of Columbia v. Wesby*, 583 U.S. 48, 63 (2018)). "In other words, existing law must have placed the constitutionality of the officer's conduct 'beyond debate.'" *Wesby*, 583 U.S. at 63 (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 735, (2011)). This demanding standard protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U. S. 335, 341 (1986). As to the second prong of the analysis, courts "recognize three sources of law that would put a government official on notice of statutory or constitutional rights: specific statutory or constitutional provisions; principles of law enunciated in relevant decisions; and factually similar cases already decided by state and federal courts in the relevant jurisdiction." *Goebert v. Lee County*, 510 F.3d 1312, 1330 (11th Cir. 2007). Courts will also look beyond caselaw to whether the case at hand is one of "obvious clarity" – i.e., where the officer's conduct "lies so obviously at the very core of what the Fourth Amendment prohibits that the unlawfulness of the conduct was readily apparent to [the official], notwithstanding the lack of fact-specific case law" on point. *Oliver v. Fiorino*, 586 F.3d 898, 907 (11th Cir. 2009) (quoting *Vinyard v. Wilson*, 311 F.3d 1340, 1355 (11th Cir. 2002)). In such

situations where it is so obvious, courts have repeatedly held that the constitutional violation is clearly established even though there is no decision in a "materially similar preexisting case." *Cantu*, 974 F.3d at 1235 (citations and internal quotations omitted). That said, "the clearly established law standard is a demanding one." *Id*. (citing *Wesby*, 583 U.S. at 63; *City & Cnty. of S.F. v. Sheehan*, 575 U.S. 600 (2015)).

The first inquiry may be a mixed question of law or fact, but the second inquiry is purely a question of law. *Hall v. Flournoy*, 975 F.3d 1269, 1275 (11th Cir. 2020). "Both elements of this test must be present for an official to lose qualified immunity, and this two-pronged analysis may be done in whatever order is deemed most appropriate for the case." *Brown v. City of Huntsville*, 608 F.3d 724, 734 (11th Cir. 2010) (generally citing *Pearson*, 555 U.S. 223). If a plaintiff fails to establish either one, then the defendant is entitled to qualified immunity.

**1. Discretionary Authority**

As to whether Nata and Paul acted within their discretionary authority, Plaintiffs do not argue their alleged acts were outside of such authority. Indeed, to take a child into protective custody is a discretionary authority vested in employees of ADHR, among others. ALA. CODE § 26-14-6 ("[A] designated employee of the State or County Department of Human Resources may take a child into protective custody . . . without the consent of the parent or guardian . . . if the circumstances or conditions of the child are such that continuing in his or her place of residence or in the care and custody of the parent . . .presents an imminent danger to that child's life or health."). Further, Nata and Paul were authorized to execute a juvenile petition. ALA. CODE § 12-15-121(a) ("A juvenile petition alleging delinquency, in need of supervision, or dependency may be signed by any person 18 years of age or older, other than a juvenile court intake officer, who has knowledge of the facts alleged or is informed of them and believes that they are true.").

Therefore, Nata and Paul acted within their discretionary authority when they performed the alleged acts.

**2. Whether Qualified Immunity Applies**

**a. Nata**

Defendants address each of the claims that Plaintiffs allege against Nata. As to Plaintiffs' claim Nata persuaded Hera to file a CHINS petition, Hera stated she filed the petition at the recommendation of the Mayor of Repton and Herrmann's State of Michigan social services worker. Doc. 89 at 23. As to Plaintiffs' claim Nata caused Plaintiffs to be separated when she allegedly lied to the juvenile court through her March 2, 2022 affidavit and she knew and approved of Paul doing the same, the decision to file a petition was discretionary and a matter left to the discretion of ADHR officials and the content of the affidavit was truthful. *Id.* at 23-24. In any case, Defendants argue Nata's affidavit was subject to consideration and evaluation by the juvenile court, which provided a procedural safeguard. *Id.* at 24-25. As to Plaintiffs' claim Nata lied to, threatened, and bribed Herrmann to entice her to lie about Hera, Defendants argue the offer to Herrmann of independent living, access to a vehicle, and college are available to eligible foster children pursuant to ADHR policy and Herrmann's placement at a psychiatric facility was pursuant to judicial adjudication. Out of an abundance of caution, Defendants argue, if Plaintiffs pled a substantive due process claim to be reasonably safe in foster care, they have failed to show Nata had actual knowledge of a substantial risk of harm to Herrmann. *Id.* at 26-27. To the extent Plaintiffs claim Nata caused Herrmann to be removed from Hera's care, custody, and management, Defendants argue the government may intervene in the family relationship when proper procedures are followed. *Id.* at 29. Further, to the extent Plaintiffs claim Nata illegally search or seized Defendants in violation of the Fourth Amendment, Defendants argue Plaintiffs have not alleged

any such conduct occurred. *Id.* at 29-30.

In response, Plaintiffs argue Nata's affidavit was filed one (1) day after CCDHR's assessment that concluded there were no safety threats and identified numerous strengths in Hera's parenting. Doc. 105 at 23. Plaintiffs argue Nata's conduct goes beyond procedural violations and rises to a level that "shocks the conscience" because she coerced Herrmann into making false allegations against Hera. *Id.* at 24.

The Court finds Nata is entitled to qualified immunity. Plaintiffs have failed to show Nata's alleged acts rise to the level of a substantive due process violation. Plaintiff have failed to show the allegations in Nata's March 2, 2022 affidavit were false and, based on the judicial record, did not object to them. As to Nata's alleged coercion of Herrmann, Nata was authorized to offer certain benefits to Herrmann and the juvenile court placed Herrmann in protective service, not Nata. Further, Plaintiffs have not shown they presented these arguments to the juvenile court. Finally, Plaintiffs have failed to cite to a factually similar case that would put Nata on notice that her conduct was unconstitutional. Therefore, the law was not clearly established that Nata's actions were so conscience shocking as to violate Plaintiffs' liberty interests.

Accordingly, the Court finds Nata is entitled to qualified immunity and Plaintiffs' federal claims against her are **DISMISSED with prejudice**.

**b. Paul**

Defendants also address each of the claims that Plaintiffs allege against Paul. As to Plaintiffs' claim that Paul carried out a plan that Nata started, Paul's contribution to which was her May 9, 2022 affidavit that she submitted to the juvenile court, Defendants argue the decision to file a petition was discretionary and a matter left to the discretion of ADHR officials and the content of the affidavit was truthful. Doc. 89 at 27-28. In any case, Defendants argue Paul's

affidavit was subject to consideration and evaluation by the juvenile court, which provided a procedural safeguard. *Id.* at 28. To the extent Plaintiffs claim Paul caused Herrmann to be removed from Hera's care, custody, and management, Defendants argue the government may intervene in the family relationship when proper procedures are followed. *Id.* at 29. Further, to the extent Plaintiffs claim Paul illegally searched or seized Defendants in violation of the Fourth Amendment, Defendants argue Plaintiffs have not shown any such conduct occurred. *Id.* at 29-30.

In response, Plaintiffs argue the April 13, 2022 Protective Services Order was based on a hearing that they contend did not occur and noncompliance with the order was cited by Paul in her May 9, 2022 affidavit to support emergency removal. Doc. 105 at 24. Plaintiffs argue Paul asserted in her affidavit that Hera left Herrmann alone with her two-year-old brother without supervision and cited to Dr. Carney's psychological evaluation, which stated this only occurred when Hera went to the store. *Id.* Plaintiffs also argue they have raised a serious factual challenge to the authenticity of the SOR Form and allege it was doctored to create a pretext to remove Herrmann from the Home. *Id.*

The Court finds Paul is entitled to qualified immunity. Plaintiffs have failed to show Paul's alleged acts rise to the level of a substantive due process violation. Plaintiff have failed to show the allegations in Paul's May 9, 2022 affidavit were false and, based on the judicial record, did not object to them. Further, Plaintiffs have failed to cite to a factually similar case that would put Paul on notice that her conduct was unconstitutional. Therefore, the law was not clearly established that Paul's actions were so conscience shocking as to violate Plaintiffs' liberty interests.

Accordingly, the Court finds Paul is entitled to qualified immunity and Plaintiffs' federal claims against her are **DISMISSED with prejudice**.

### 3. Dees

Defendants argue Plaintiffs fail to state any action that was taken by Dees that violated Plaintiffs' constitutional rights. Doc. 89 at 30-31. Indeed, Plaintiffs concede Dees is entitled to qualified immunity. Doc. 105 at 2.

Accordingly, the Court finds Dees is entitled to qualified immunity and Plaintiffs' federal claims against her are **DISMISSED with prejudice**. Since the Court has found Nata, Paul, and Dees are entitled to qualified immunity, the Court will not address their arguments that they are entitled to state statutory immunity, absolute prosecutorial immunity, and the statute of limitations bar Plaintiffs' claims.

## D. Civil Conspiracy

Defendants argue Plaintiffs have failed to plead there is no available state process to remedy the alleged procedural defects to establish constitutionally inadequate process to prove their procedural due process claims. Doc. 89 at 33-36. Defendants also argue Plaintiffs only allege vague and conclusory statements as to an agreement and has not produced evidence to prove such. *Id.* at 36-38.

In response, Plaintiffs concede their civil conspiracy claims are due to be dismissed. Doc. 105 at 2.

Accordingly, Defendants' motion for summary judgment as to Plaintiffs' civil conspiracy claims are **DISMISSED with prejudice**.

# V. CONCLUSION

Accordingly, the Motion for Summary Judgment by Defendants Jodie Nata, Stephanie Paul, and Bernadette Dees (Doc. 90) is **GRANTED**, and the claims against Defendants Jodie Nata, Stephanie Paul, and Bernadette Dees are **DISMISSED with prejudice**.

A separate judgment will issue pursuant to Fed. R. Civ. P. 58.

**DONE** and **ORDERED** this 30th day of September 2026.

/s/ Terry F. Moorer
TERRY F. MOORER
UNITED STATES DISTRICT JUDGE